**Christopher SIPPLE, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 79A04–0211–CR–572.**

Court of Appeals of Indiana.

May 15, 2003.

---

Steven Knecht, Vonderheide & Knecht, Lafayette, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, George P. Sherman, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

Christopher Sipple (Sipple) appeals the maximum eight-year sentence he received

after pleading guilty to Involuntary Manslaughter.[1] We affirm.

## Issue

The issue here is whether the trial court properly sentenced Sipple to the maximum eight years for his crime.

## Facts and Procedural History

Shortly after midnight on January 24, 2001, members of the Tippecanoe County Sheriff's Department arrived at Sipple's parents' residence in response to a call regarding a shooting. They found Sipple's pregnant twenty-one-year-old wife Christina on the floor near the doorway between the bedroom and living area of the basement suite in which the couple lived. Her feet were apparently in the living area, and her head was in the bedroom. Sipple and his father Wes were standing by Christina, who had a gunshot wound to her abdomen. Police officers did not observe any blood around the room other than that which was coming from Christina's wound. The officers found a loaded shotgun on the bed inside the bedroom. Paramedics soon arrived, but Christina was pronounced dead shortly thereafter.

Sipple was taken by police officers to a police vehicle and was questioned about the incident. After speaking with officers in the vehicle, Sipple was taken to the police station where he provided additional details about the shooting. Both conversations were recorded. Sipple stated that he and a friend began hunting coyotes behind the residence that Sipple and Christina shared with Sipple's parents at some point before 11:00 p.m. The pair hunted for around twenty minutes, and then returned to the residence. The two men and their wives played cards in the living area of the basement until around 11:30 p.m., when Sipple's hunting partner and his wife left.

Sipple and Christina went to bed. At some point, Sipple walked upstairs from the basement to use the restroom. The lights in the basement were off, and the area was dark. Despite the darkness, Sipple noticed as he came back down the stairs that he had left the 12–gauge shotgun used on the coyote hunt against or near the wall next to the bedroom door. Sipple stated that he realized he had forgotten to unload the weapon, so he evidently decided to bring it into the lightless bedroom where his wife was sleeping to remove the shells from the gun. He stated that he was carrying the gun with his left hand on or near the fore-stock pump mechanism, his right hand on the hand-grip area of the stock near the trigger and the barrel up and across his body to the left in a port arms position. Sipple was adamant that his right index finger was not inside the trigger guard. Sipple told the officers that as he was walking with the loaded shotgun in the darkness toward the doorway to the bedroom, he tripped over a piece of furniture and fell to the ground while still holding the weapon. According to Sipple, his finger was not on the trigger, and the gun's safety was on. Sipple fell on top of the weapon and it discharged a single shot in the direction of the doorway. Sipple heard a scream, looked up from the floor, and even though it was too dark to see the piece of furniture on which he tripped, he was able to see his wife lying on the ground with a wound to her abdomen. He then turned on the lights to the bedroom and threw his gun on the bed. His parents came down the stairs to the basement and turned on the lights to the living area. Sipple said that his parents handed him a towel that he used to slow the bleeding from Christina's wound until the ambulance arrived.

1. IND.CODE § 35–42–1–4.

In the early morning hours of January 25, 2001, Dr. Donna Smith performed an autopsy on Christina. The autopsy indicated that Christina had been struck by a shotgun blast coming from above her head rather than from below her waist, as Sipple's version of events suggested. The muzzle of the gun was between three and six feet from Christina at the time of the shooting.

Police officers returned to Sipple's residence after the autopsy to look for any evidence of splattered blood consistent with the kind of wound Christina sustained. They found none. The officers also took various measurements of the basement and of Sipple's gun. Taking these measurements, as well as information obtained during the autopsy regarding the path of the shotgun blast and the distance between the muzzle of the gun and Christina's body, police officers concluded that Christina was most likely shot while lying on the ground by someone standing above her head and behind her.

Police officers spoke with Sipple again during the afternoon of January 25, 2001 to discuss the discrepancies between his story and the pathology evidence. As before, Sipple stated that he was walking with the gun, but this time told the officers that his right index finger was inside the trigger guard. He repeated his claim that he tripped over a piece of furniture on the way to the bedroom, but now said that the gun went off as he tripped, and that he fell over after the shot was fired. He heard his wife say that she couldn't move, so he turned on the lights in the bedroom and saw his wife on the ground in the doorway. Sipple did not explain how he was able to step over his wife's body without tripping over her in the total darkness to get into the bedroom to turn the lights on.

On January 26, 2001, police officers returned to the residence with a search warrant, and performed testing to reveal the presence of blood evidence in the basement. They found evidence of blood on the wall of the bedroom near where Christina's body was found, as well as evidence of blood on a nearby CD rack. Blood on both areas appeared to have been wiped off. In addition, the testing indicated that some amount of blood had been wiped from the carpet before paramedics arrived. Members of the Sipple family denied cleaning the area.

On January 29, 2001, Sipple gave yet another statement to the police in which he changed key points of his story. Sipple again said that he came down the stairs to the pitch-black basement after visiting the restroom and somehow sensed the presence of his loaded shotgun leaning against the wall. He picked up the weapon and proceeded toward the equally darkened bedroom to unload it when he bumped into his wife as she was walking out through the doorway. According to Sipple, he knocked Christina down. Sipple generally stated that he was carrying his gun as described above, with the fore-stock in his left hand, his right hand on the stock near the trigger, and the barrel generally pointed ahead. This time, however, Sipple stated that the barrel of the gun was pointed down rather than up. Sipple claimed that he felt his wife startle as he ran into her. He did not explain how his body contacted his wife before the protruding barrel of the shotgun did. After knocking his wife to the ground, Sipple evidently continued through the doorway in complete darkness, stepping over but not on his wife's prone body. He then turned around, swinging the barrel of the downward-pointed shotgun in his wife's direction. Just as the barrel of the gun was centered on Christina's abdomen, it mysteriously discharged. Sipple, who never brought loaded guns into his house and who always

used a gun's safety trigger lock, did not explain how the weapon fired. He denied seeing blood on the wall and CD rack, the existence of which had been revealed in testing done on January 26, and denied cleaning up any blood.

On November 28, 2001, the State charged Sipple with Reckless Homicide, Criminal Recklessness, and Involuntary Manslaughter, each as a Class C felony. Sipple eventually pleaded guilty to Involuntary Manslaughter. During the September 27, 2002 hearing on his guilty plea, Sipple abandoned the story he had told on January 29, 2002, reverting instead to a form of the version of events related to police in his earlier statements. He testified that the shotgun went off after he tripped on a small piece of furniture on his way into the bedroom. The State did not object to Sipple's testimony, and made no effort to rescind the plea agreement and charge Sipple with a more serious crime on the basis of the discrepancies between the evidence and Sipple's constantly changing stories.

He related this version of events during the November 13, 2002 sentencing hearing. During the hearing, Sipple added that he began to fall to the ground after tripping over the furniture. Rather than dropping the weapon, which was pointed off to his left, to catch himself as he fell, however, Sipple swung the gun around to the darkened doorway in mid-fall and inexplicably pulled the trigger, shooting his wife.

At the conclusion of the sentencing hearing, the trial court imposed the maximum eight-year sentence for Sipple's Class C felony conviction. In support of the enhancement, the trial court noted that it had received numerous letters from Christina's family and friends demanding that Sipple receive the maximum possible sentence for taking the lives of Christina and her unborn child. The trial court found the killing's psychological impact on Christina's family and friends supported the maximum enhancement. The trial court also found Sipple's lack of remorse over Christina's death, as discussed by several of the letter writers and by those who testified during the hearing, warranted enhancement. The court further considered what it saw as Sipple's efforts to conceal the truth about the shooting to be aggravating. Finally, the trial court found that the maximum enhancement was justified by the facts and circumstances of the case, which in the view of the court amounted to a degree of recklessness beyond that normally associated with the crime for which Sipple was being sentenced. The only mitigator Sipple proffered was his clean criminal record. The trial court declined, however, to ascribe much significance to this fact, and determined that it did not outweigh the aggravators.

Sipple appeals.

### Discussion and Decision

### A. Standard of Review

 Determining the appropriate sentence is within the trial court's discretion, and the trial court will only be reversed if it has abused that discretion. *Bacher v. State*, 722 N.E.2d 799, 801 (Ind. 2000). The trial court has the discretion to increase or decrease a presumptive sentence upon finding aggravating or mitigating circumstances. *Id.* The weighing of those factors is soundly within the court's discretion. *Id.*

 When the court imposes a sentence other than the presumptive sentence, we examine the record to determine whether the trial court sufficiently explained its reasons for selecting the sentence it imposed. *Kile v. State*, 729 N.E.2d 211, 213 (Ind.Ct.App.2000). The trial court must identify all significant ag-

gravating and mitigating circumstances, explain why each circumstance is aggravating or mitigating, and weigh mitigating circumstances against the aggravating factors. *Utley v. State,* 699 N.E.2d 723, 730 (Ind.Ct.App.1998). While a sentencing court must consider all evidence of mitigating circumstances presented by a defendant, the finding of mitigating circumstances rests within the sound discretion of the court. *Bacher,* 722 N.E.2d at 803. The court cannot ignore mitigating factors that are clearly supported by the record. *Widener v. State,* 659 N.E.2d 529, 534 (Ind.1995). The failure to find a mitigating circumstance clearly supported by the record may imply that the circumstance in question was overlooked. *Id.* However, the trial court need not consider, and we will not remand for reconsideration of, alleged mitigating factors that are highly disputable in nature, weight, or significance. *Wilkins v. State,* 500 N.E.2d 747, 749 (Ind.1986). Moreover, a sentencing court need not agree with the defendant as to the weight or value to be given to proffered mitigating facts. *Bacher,* 722 N.E.2d at 803. Indeed, a sentencing court is under no obligation to find mitigating factors at all. *Echols v. State,* 722 N.E.2d 805, 808 (Ind.2000). Ultimately, a single aggravator may support the enhancement of a sentence, and we may affirm an enhanced sentence when a trial court has relied in part upon improper aggravators so long as the trial court relied on other proper aggravators to enhance the sentence. *Hollen v. State,* 761 N.E.2d 398, 402 (Ind.2002).

### B. Analysis

#### 1. Sentence Enhancement

Sipple's conviction for Involuntary Manslaughter as a Class C felony came with a presumptive sentence of four years, to which up to four years could be added for aggravating circumstances, and as many as two years subtracted for mitigating circumstances. *See* IND.CODE § 35–50–2–6(a). The trial court, as noted above, enhanced Sipple's four-year presumptive sentence by the maximum four years. Sipple contends that his sentence is improper because it was enhanced on the basis of invalid aggravators and did not account for significant mitigators. Specifically, Sipple claims that the trial court erroneously identified the wishes of Christina's family and friends, Sipple's efforts to conceal the truth about the shooting, and the nature and circumstances of the recklessness involved here. Sipple does not challenge the trial court's use of his lack of remorse as an aggravator. Sipple also argues that his lack of criminal history and his guilty plea should have been considered and given weight as mitigators.

#### a. Aggravators

#### (1) Victim Impact

██ Sipple correctly notes that the loss that accompanies a person's death and its impact on the person's family and friends is largely encompassed within the range of impact which the presumptive sentence for Involuntary Manslaughter is designed to punish, and should therefore generally not be considered a factor favoring the imposition of an enhanced sentence. *See Pickens v. State,* 767 N.E.2d 530, 535 (Ind.2002) (noting that impact of loss of murder victim's life is part of what presumptive sentence for murder punishes). The impact resulting from a person's death may, however, constitute a proper aggravator when the defendant's actions foreseeably caused a level of devastation not typically associated with the commission of the offense in question. *Id.* The trial court found that the impact of Christina's death on her family was unusually severe because they lost not only Christina, but also her unborn child. The

loss of Christina's unborn child to her family constituted an impact of a destructive nature not typically associated with the crime of Involuntary Manslaughter. Given that Sipple was well aware of his wife's pregnancy, this impact was not unforeseeable. The trial court was therefore entitled to conclude that the impact on Christina's family was a factor justifying an enhanced sentence.

### (2) Concealment of Truth

 Sipple also complains that the trial court's reliance upon what the court viewed as Sipple's efforts to conceal the truth about the shooting was improper. As Sipple sees it, when the trial court noted that Sipple had changed his story numerous times, the trial court was engaged in an effort to compensate for what the court felt was a plea deal too favorable to Sipple. In light of the fact that the evidence here arguably supported a murder charge, Sipple's concerns are understandable. Indeed, some of those who wrote to the trial court judge urging the imposition of the maximum sentence suggested that Sipple intentionally killed his wife after taking up with another woman. The State did not, however, charge Sipple with murder, and it would have been entirely improper for the sentencing court here to have enhanced Sipple's sentence out of the belief that Sipple could have been charged or convicted of a greater crime, or that he was allowed to plead guilty to a lesser offense than the evidence might have supported. *See Cloum v. State,* 779 N.E.2d 84, 92 (Ind.Ct.App.2002) (instructing trial court upon remand to refrain from enhancing presumptive sentence for voluntary manslaughter conviction obtained after guilty plea, when defendant initially charged with murder).

We do not think, however, that the trial court's recognition that Sipple's story had been a work in progress revealed an improper intent to impose extra punishment. As noted in *Cloum,* the Indiana Supreme Court concluded in *Gambill* that the trial court improperly enhanced a sentence for voluntary manslaughter to compensate for what the trial court felt should have been a sentence for murder when the judge explicitly said that he thought that voluntary manslaughter was not the right verdict and that the evidence justified a murder conviction. 779 N.E.2d at 92 (citing *Gambill,* 436 N.E.2d at 305). In *Cloum,* however, we also noted that our supreme court found in another case that the trial court's statement attributing the defendant's conviction of voluntary manslaughter rather than murder to the skill of the defendant's lawyer in establishing the element of sudden heat in the face of conflicting evidence was "not a statement 'so resolutely opposed to the jury verdict as was the case in *Gambill,*'" and that the resulting sentence for voluntary manslaughter in *Cloum* was therefore "not suspect." *Id.* at 91 (quoting *Wilson v. State,* 458 N.E.2d 654, 656 (Ind. 1984)).

 In this case, the trial court did not state that Sipple should have been charged with a greater offense than Involuntary Manslaughter or either of the other two Class C felonies with which he was charged, or that Sipple could have been convicted of a greater offense. There is simply nothing in the record to suggest that the trial court attempted to compensate for charges not brought or convictions not obtained. The trial court only noted that Sipple's story was inconsistent, and stated that the court found this conduct troubling. As the State notes, Sipple's disinclination to provide an accurate account of the events leading up to the shooting goes to his character, a factor the trial court was required to consider during sentencing. *See* IND.CODE § 35–38–1–

7.1(a)(3)(B). Moreover, a trial court may consider a defendant's effort to interfere in the investigation of a crime by concealing information to be an aggravating circumstance. *See Kingery v. State,* 659 N.E.2d 490, 498 (Ind.1995). The trial court was entitled to conclude that Sipple attempted to mislead the police in their investigation of the shooting by relating various inconsistent stories, and to find this circumstance aggravating.

### (3) Degree of Recklessness

■■■ Sipple next argues that the trial court should not have enhanced his sentence on the basis of its conclusion that the crime was committed with an unusually high degree of recklessness, because recklessness was a material element of Sipple's crime.[2] A material element of a crime may not also constitute an aggravating circumstance. *Ellis v. State,* 707 N.E.2d 797, 804 (Ind.1999). The trial court may, however, enhance a sentence on the basis of the particularized circumstances of the criminal act so long as the court explains why those circumstances warrant the enhancement. *Id.*

■■■ As noted above, the evidence in this case indicated that Sipple picked up a loaded shotgun in a completely dark room and, without turning on the lights, walked through the darkness with his hand on or near the trigger, the safety evidently off, and the barrel pointed ahead with the intention of unloading the weapon in the darkened bedroom where his pregnant wife was sleeping. The court explained its reliance on these facts as follows:

> Again, in the sentencing statutes although the charge[d] crime is one of recklessness, the Court can in certain circumstances look at the facts and circumstances surrounding the recklessness and I do find the degree of recklessness in this case to carry a loaded weapon with the safety not on through a dark room knowing that there are people present in that room is far beyond the normal amount of recklessness that the court can accept in a case like this.

(Tr. 64.) The trial court's explanation was significantly more than the mere recitation of the elements of the offense, and adequately supported the finding of this aggravating circumstance.

### b. Mitigators

### (1) Lack of Criminal History

■■■ Sipple also argues that the trial court failed to properly consider his clean criminal record as a mitigator. A trial court must consider a defendant's criminal record during sentencing, IND. CODE § 35–38–1–7.1(a)(3)(C), and may take the defendant's lack of a history of criminal activity into account as a mitigating circumstance. *Id.* at § –7.1(c)(6). Here, the trial court recognized that Sipple had no prior criminal record, but declined to ascribe this fact any mitigating weight. "In a criminal justice system founded on the principles of reformation, *see* IND. CONST. art. I, § 18, where reasonably possible, sentencing orders should distinguish

---

**2.** Recklessness was a material element of Involuntary Manslaughter here. Indiana Code section 35–42–1–4(c) provides that

> (c) A person who kills another human being while committing or attempting to commit:
> (1) a Class C or Class D felony that inherently poses a risk of serious bodily injury;
> . . .

> commits involuntary manslaughter, a Class C felony.

Sipple was charged with Involuntary Manslaughter for killing Christina "while committing or attempting to commit, a Class C felony, to wit: Reckless Homicide or Criminal Recklessness Committed by Means of a Deadly Weapon Resulting in Serious Bodily Injury,...." (App. 7.)

between first offenders and repeat offenders." *Bluck v. State,* 716 N.E.2d 507, 514 (Ind.Ct.App.1999). Thus, the absence of a criminal record is usually a factor entitled to "substantial mitigating weight." *See Loveless v. State,* 642 N.E.2d 974, 976 (Ind. 1994).

■ Nevertheless, as noted above, the sentencing court need not agree with the defendant as to the weight or value to be given to proffered mitigating facts, *Bacher,* 722 N.E.2d at 803, and ultimately is not obligated to find mitigating factors at all, *Echols,* 722 N.E.2d at 808. A trial court may properly conclude that a defendant's lack of a criminal record is not entitled to mitigating weight. *Jones v. State,* 467 N.E.2d 681, 684 (Ind.1984). The trial court considered Sipple's clean criminal record but declined to find it mitigating under the circumstances. This determination was within the court's discretion.

### (2) Guilty Plea

Sipple additionally contends that the trial court erred by failing to conclude that his guilty plea was a significant mitigating factor. Sipple did not argue during sentencing that his guilty plea should be considered, and the trial court did not specifically mention the plea during the hearing. Nevertheless, as noted above, the sentencing court may not ignore significant mitigating factors that are clearly supported by the record, and the court's failure to find a clearly supported mitigating circumstance may imply that the circumstance in question was overlooked. *Widener v. State,* 659 N.E.2d 529, 534 (Ind.1995). Thus, to support his allegation that the trial court improperly failed to properly consider his guilty plea, Sipple was required to establish that the guilty plea was both significant and clearly supported by the record. *Antrim v. State,* 745 N.E.2d

246, 248 (Ind.Ct.App.2001). The plea was not a significant mitigator.

■ "[N]ot every plea of guilty is a significant mitigating circumstance that must be credited by a trial court." *Trueblood v. State,* 715 N.E.2d 1242, 1257 (Ind. 1999). But when a guilty plea "saves the State the time and expense inherent in a lengthy trial" and "accordingly extends a benefit to the State and the victim's family by avoiding a full-blown trial, as well as demonstrating the defendant's acceptance of responsibility for a crime," the plea should be accorded significant mitigating weight. *Id.* In this case, while Sipple's plea saved the State the expense and time of a trial, the benefit to the State was moderate at best given the fact that Sipple had already given several statements to the police in which Sipple admitted facts that, at a minimum, established his guilt of the crime to which he pleaded. Indeed, there was nothing in Sipple's testimony given during the hearing on his guilty plea that had not come out in one or more of his earlier statements to the police. Moreover, in light of the position Christina's family took with regard to Sipple's sentencing and their evident desire to see Sipple prosecuted to the maximum extent possible, the avoidance of further family trauma does not weigh heavily in favor of the mitigating effect of Sipple's guilty plea. Finally, Sipple's story to the police conflicted with forensic evidence and changed in important respects each time he gave a statement. The story changed again between the time he agreed to plead guilty and the date of the hearing on his plea. Sipple's plea therefore hardly indicates his acceptance of responsibility for the crime. In sum, Sipple failed to establish that his guilty plea was a significant mitigating circumstance, and we cannot say that the trial court erred by declining to identify it as such.

### c. Balancing

 The trial court found the wishes of Christina's family and friends, Sipple's efforts to conceal the truth about the shooting, the nature and circumstances of the recklessness involved here, and Sipple's lack of remorse as factors favoring the imposition of an enhanced sentence. The trial court's findings with regard to the first three factors were not inappropriate, and Sipple does not challenge the court's use of his lack of remorse to support the enhancement. Moreover, the trial court did not err by declining to find Sipple's guilty plea and his lack of a criminal record mitigating. The enhancement of Sipple's sentence was accordingly within the trial court's discretion.

### 2. Sentence Revision

Pursuant to the authority granted by Article Seven, section six of the Indiana Constitution, Appellate Rule 7(b) provides that a reviewing court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." In general, the maximum possible sentences should be reserved for the worst offenders and offenses. *See Buchanan v. State,* 767 N.E.2d 967, 974 (Ind.2002). Sipple contends that the maximum enhancement of his sentence was inappropriate and should therefore be revised because he was not the worst offender and did not commit the worst of offenses.

In *Buchanan,* our supreme court attempted to clarify the rule regarding the imposition of maximum sentences as follows:

> This is not, however, a guideline to determine whether a worse offender could be imagined. Despite the nature of any particular offense and offender, it will always be possible to identify or hypothesize a significantly more despicable scenario. Although maximum sentences are ordinarily appropriate for the worst offenders, we refer generally to the *class* of offenses and offenders that warrant the maximum punishment. But such class encompasses a considerable variety of offenses and offenders.

767 N.E.2d 974 (emphasis in original). In this case, Sipple pleaded guilty to and was convicted of involuntary manslaughter. Our discussion above relating to the propriety of the trial court's identification of the degree of recklessness with which Sipple committed this crime leads us to conclude that Sipple was among the worst involuntary manslaughter offenders and his crime was among the worst within that class of offenses. Again, Sipple picked up a loaded shotgun in a completely dark room and, without turning on the lights, walked through the darkness with his hand on or near the trigger, the safety evidently off, and the barrel pointed ahead with the intention of unloading the weapon (which was done by discharging it) in the darkened bedroom where his pregnant wife was sleeping. In the process, Sipple killed his wife and their unborn child. Sipple does not suggest how this scenario could have been more egregious and yet remain involuntary manslaughter and not a more serious offense. The maximum enhancement of Sipple's sentence was not inappropriate.

Affirmed.

BROOK, C.J., and NAJAM, J., concur.