**Steven WRIGHT, Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

No. 49A02–0405–CR–405.

Court of Appeals of Indiana.

Dec. 6, 2004.

Rehearing Denied Jan. 11, 2005.

Michael R. Fisher, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Maureen Ann Bartolo, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

BAKER, Judge.

Appellant-defendant Steven Wright appeals from his convictions for Neglect of a Dependent,[1] a class B felony, and Battery,[2] a class B felony, and from the sentence imposed for those offenses. Specifically, Wright contends that (1) there was insufficient evidence to support the convictions; (2) the trial court did not properly balance the aggravating and mitigating factors at sentencing and that it erred in imposing consecutive sentences; and (3) the sentence imposed by the trial court was inappropriate in light of the nature of the offense and the character of the offender. Finding that there was ample evidence to support Wright's convictions and finding no sentencing errors, we affirm.

*FACTS*

The facts most favorable to the judgment are that in April 1999, Ma.W., the five-month-old daughter of Wright and his wife, was taken to the hospital. She was discovered to have seven right rib fractures, two left rib fractures, and a healing fracture in her right femur. Wright was Ma.W.'s primary caretaker. Within days of Ma.W.'s hospitalization, Child Protective Services and law enforcement investigated Wright, who contended that a family friend or uncle had accidentally broken Ma.W.'s femur. According to Wright, the family friend had lost his grip when holding Ma.W. and grabbed her too hard to prevent her from falling to the ground, fracturing her femur. No one, including Wright, has been able to locate this family friend. Wright had no explanation as to how Ma.W. sustained the rib fractures other than positing that he had held her too tightly. No charges were filed at that time.

On September 2, 2001, officers of the Marion County Sheriff's Department were called to investigate the health and welfare of Wright's seven-month-old twins, M.W. and S.W. Wright's sister-in-law had recently seen the infants, and when she became alarmed at the condition of the twins, she called the authorities. When the officers arrived at Wright's house, it took him three to four minutes to answer their knock at the door. When he appeared, the officers noted that he was wrapped in a towel and had an odor of alcohol on his breath.

The officers observed the twins lying on the couch and were both "immediately alarmed." Tr. p. 70. The twins' heads

1. Ind.Code § 35–46–1–4.

2. Ind.Code § 35–42–2–1.

were abnormally large, and their condition appeared sufficiently grave that the officers instantly called an ambulance. The officers then went upstairs and found Ma. W., at that time almost three years old, and her sister Me.W., at that time almost two years old, standing in their cribs with their arms outstretched to the officers.

Upon being examined at the hospital, it was discovered that M.W. had nineteen fractures, including fractures of her skull, arms, wrists, legs, knees, a finger, and her chin. S.W. had seventeen, possibly eighteen, fractures, including fractures of his ribs, arms, wrists, legs, ankles, and skull. Both twins had large subdural hematomas and brain atrophy, which required immediate surgery to place shunts in their skulls to drain the fluid and reduce the pressure on their brains. They also exhibited signs of significant malnutrition and limited spontaneous movement. M.W. had a large piece of tissue hanging off the inside of her mouth, cuts and tears on the top and bottom of her interior lips, and significant bruising on her back and shoulder. S.W.'s ribs were protruding and he had a hemorrhage in one eye. Each baby weighed just over ten pounds and had the body of an average two-month-old infant and the developmental skills of an average newborn baby.

Medical personnel performed a series of tests to rule out any medical reason why the children were in such grave shape, checking for a variety of diseases, including osteogenesis imperfecta. After ruling out all such conditions, doctors concluded that the twins had been abused and neglected. After eight days of hospitalization, the twins improved markedly, each gaining several pounds, becoming more mobile, following objects with their eyes, and beginning to smile.

S.W. is currently developmentally delayed, has cerebral palsy, cannot walk on his own without the assistance of a walker, and has a seizure disorder and severe brain damage. M.W. can walk without assistance but also has cerebral palsy, severe brain damage, and a seizure disorder. Ma.W. is under a psychologist's care, is emotionally traumatized, suffers from uncontrollable crying, and is afraid to interact with other people.

On November 22, 2001, the State charged Wright with two counts of neglect of a dependent as the result of the malnutrition or brain atrophy of M.W. and S.W., and six counts of battery because of the fractures and brain injuries of M.W. and S.W. and the broken femur and rib fractures of Ma.W. During a bench trial beginning on February 26, 2004, Wright admitted that he was the children's primary caregiver because his wife worked full time for the United States Postal Service. Wright asserted that no one, including his wife, had harmed the children, contending that their injuries were a result of a variety of medical conditions.

The trial court found Wright guilty on all counts except for the two counts of battery related to the twins' brain injuries. On April 13, 2004, the trial court conducted a sentencing hearing, at which it commented as follows:

> The Court finds as aggravating the nature and circumstances of the offense. This is a particularly heinous crime which the Court finds to be particularly aggravating. You were the primary care giver of all four of your children.... Your seven month old twins, [S.W.] and [M.W.], were clearly in a state of distress in a critical condition. The critical condition to these babies was obvious.... Their heads were enlarged and swollen. Their bodies were malnourished and thin. Their eyes were popping out of their heads. You had them wrapped and bound in blankets so

that they couldn't move their arms or limbs. When your wife's sister came to the home that day—and you had isolated these children from the entire family—no one in your wife's family had seen these babies since they were first born. But when the sister comes to the home, she sees and it is obvious to her that something is wrong with these babies and that is why the police are called and alerted to the incident.... Your failure to seek medical treatment has resulted in brain damage and physical disabilities.... Detective Williams testified that this is the worst case of child abuse that she's ever seen. Dr. Hibbard—Dr. Roberta Hibbard, who is an expert and has examined thousands of children, said this was the worst case of abuse she'd ever seen.... What you did to these children, to these babies, is unconscionable. You tortured these children both physically and mentally.... First of all you said you didn't take them to the hospital to the doctor [sic], because you didn't have medical insurance, despite the fact your wife worked at the Post Office. And the United States Government, the Postal Service, provides health insurance. You could have taken them to a free clinic—anyone—no emergency room would have turned those babies away. And you testified at trial that you had Eighteen Hundred Dollars ($1,800), that Friday when your sister-in-law came to the home—which you used to purchase this Mercedes automobile. So the Court finds the entire nature and circumstances of this offense and the Defendant's character to be particularly aggravating, and for that reason—for those aggravators, the Court is going to sentence you to fifteen (15) years. The Court will consider as mitigating the fact that you have no prior criminal history. The Court's going to find that the aggravators outweigh the mitigators .... and I'm going to sentence you to fifteen (15) years executed in the Department of Corrections [sic] on Count One. Count Two ... [t]he Court finds the same aggravating and mitigating circumstances as previously stated. Finds that the aggravating circumstances outweigh the mitigators.... Count Three ... [t]he Court finds the same aggravating and mitigating circumstances as previously stated.... Count Four ... [t]he Court finds the same aggravating and mitigating circumstances.... Count Seven, the Battery of your older daughter, [Ma.W.] ... The fractures—I'm sorry—also suffered a fractured femur which you said was caused when some mysterious uncle who was never—you've never been able to produce a name or a location of this person—that he broke the baby's arm [sic]—that he dropped her. And held her by the arm [sic] and broke it, but all the evidence—the circumstantial evidence overwhelmingly is that you caused the—the fractured femur to [Ma.W.]. [Ma.W.] is emotionally traumatized also. She suffers from nightmares and eating disorder. The Court finds that the aggravating circumstances on Count Seven outweigh the mitigating circumstances of your lack of a prior criminal history.... Count Eight ... [o]n that count, sir, the Court finds the same aggravating and mitigating circumstances as previously stated....

Tr. p. 677–81.

The trial court sentenced Wright as follows: Count I, class B felony neglect of M.W., fifteen years; Count II, class B felony neglect of S.W., fifteen years; and Count VII, class B felony battery against Ma.W., fifteen years. The trial court ordered that Counts I, II, and VII be served concurrently with Count III, class B felony battery against M.W., fifteen years; Count

IV, class B felony battery against S.W., fifteen years; and Count VIII, class B felony battery against Ma.W., fifteen years. Counts III, IV, and VIII were ordered to be served consecutively. Wright is therefore serving an aggregate executed sentence of forty-five years, and he now appeals.

## DISCUSSION AND DECISION

### I. Sufficiency of the Evidence

Wright contends that the evidence presented to the trial court was insufficient to sustain his convictions for battery and neglect of a dependent. As we consider this argument, we note that when reviewing a claim of insufficient evidence, we consider the evidence most favorable to the verdict, along with all reasonable inferences to be drawn therefrom. *Winn v. State,* 748 N.E.2d 352, 357 (Ind.2001). The reviewing court neither reweighs the evidence nor judges the credibility of the witnesses, and will affirm the conviction if there is substantial evidence of probative value from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Fry v. State,* 748 N.E.2d 369, 373 (Ind.2001). Evidence is insufficient only when no rational fact finder could have found the defendant guilty beyond a reasonable doubt. *Bradford v. State,* 675 N.E.2d 296, 298 (Ind.1996). Indeed, a verdict will be upheld based on circumstantial evidence alone if the circumstantial evidence supports a reasonable inference of guilt. *Blanchard v. State,* 802 N.E.2d 14, 37–38 (Ind.Ct.App. 2004).

### A. Counts III and IV: Class B Felony Battery on M.W. and S.W.

Wright argues that there was insufficient evidence to sustain his convictions for battery with respect to M.W. and S.W., stemming from the twins' multiple fractures found by the hospital in September 2001. Indiana Code section 35–42–2–1 provides, in pertinent part, as follows:

(a) A person who knowingly or intentionally touches another person in a rude, insolent or angry manner commits battery, a Class B misdemeanor. However, the offense is:

\* \* \* \*

(4) a Class B felony if it results in serious bodily injury to a person less than fourteen (14) years of age and is committed by a person at least eighteen (18) years of age. . . .

To convict a defendant of battery with injury to a child, therefore, the State must prove beyond a reasonable doubt that he knowingly or intentionally touched a person less than fourteen years of age in a rude, insolent or angry manner and that touching resulted in serious bodily injury. *Mitchell v. State,* 813 N.E.2d 422, 427 (Ind. Ct.App.2004).

In this case, the State presented evidence that in September 2001, when they were admitted to the hospital, seven-month-old M.W. had nineteen fractures, including fractures of her skull, arms, wrists, legs, knees, finger, and chin. S.W., also seven months old, had seventeen, possibly eighteen, fractures, including fractures of his ribs, arms, wrists, legs, ankles, and skull. Wright admitted that he was the children's primary caretaker and denied that the children's mother or any other person had harmed the twins. Wright's only defense was that the twins had sustained their fractures because they suffer from a bone disease called osteogenesis imperfecta.

The State presented evidence that the children did not suffer from any such disease, and that in fact, their fractures were the result of abuse. At Wright's trial, Dr. Kimberly Applegate, a pediatric radiolo-

gist, testified as to M.W.'s injuries as follows: M.W.'s fractures indicated a higher degree of force than from a single fall and were typical of non-accidental trauma; the spiral fractures in her arm were a common injury in abuse cases, occurring either from a direct blow or from a child being thrown and hit against an object; her fractured finger is typical of someone either hitting the finger directly or stepping on it; and based upon Dr. Applegate's training and experience, she believed that the fractures were the result of non-accidental trauma. Tr. p. 136–40, 150–51. As to S.W.'s injuries, Dr. Applegate testified as follows: a fractured clavicle usually occurs from non-accidental trauma and that it is an unusual injury for an infant to sustain; some of S.W.'s fractures were fairly recent and some were fairly well healed; based upon Dr. Applegate's training and experience, she believed that the fractures were the result of non-accidental trauma. *Id.* at 146–51. She testified that it was one of the worst cases of child abuse that she had ever seen. *Id.* at 177.

Dr. Applegate further testified that the likelihood of misdiagnosing osteogenesis imperfecta is exceedingly rare. *Id.* at 154, 164. Moreover, the twins' films did not show evidence of deformity in the bones, which is something the medical community looks for as a key symptom of the disease.

In light of Wright's admission that he was the twin's primary caregiver and his assurances that no one else injured the twins, in conjunction with the overwhelming circumstantial evidence that the twins' fractures were a result of abuse and not the result of a bone disease, we hold that there was sufficient evidence to sustain Wright's convictions on these counts.

### B. Counts VII and VIII: Class B Felony Battery on Ma.W.

■ Wright contends that there was insufficient evidence to sustain his convictions for battery with respect to Ma.W., stemming from the fractures to her ribs and femur. Wright's only explanation for the fractured femur is that a family friend or uncle injured Ma.W. as he prevented her from falling to the floor, but Wright has been unable to locate this person and other family members did not know who this man was. His only explanation for her fractured ribs is that he must have held her too tightly.

The State again presented testimony from Dr. Applegate. After reviewing Ma.W.'s full body x-ray, Dr. Applegate testified as follows: Ma.W.'s fractured femur was a type of injury that occurs in non-accidental trauma, and is often due to "a twisting or pulling or a combination of those things", *id.* at 127; Ma.W.'s rib fractures were a type that commonly result from a "squeezing mechanism," and they occurred after the fracture to her femur. *Id.* at 125, 128.

Detective Diana Williams testified that she reviewed Ma.W.'s records when she considered the twins' condition. Detective Williams observed similarities between Ma.W.'s injuries and the twins' injuries, including the fact that Wright and his wife were the primary caregivers, with few others having contact with the children, that the children's mother worked outside the home leaving Wright home alone with them, and that there were many similar rib fractures. *Id.* at 495, 497.

Wright again raised the argument that Ma.W. suffered from osteogenesis imperfecta, which may have caused her fractures. The State presented testimony that in fact, Ma.W. did not suffer from the disease. While Wright points out that he presented his own witness—a registered nurse with pediatric experience—who testified that she observed symptoms of osteogenesis imperfecta in Ma.W., we will

neither reweigh the evidence nor judge the credibility of witnesses.

In light of Wright's admissions that he was Ma.W.'s primary caregiver, that they had few visitors, and that his wife never injured Ma.W., in conjunction with the State's evidence that Ma.W.'s fractures were the result of non-accidental trauma that had occurred on more than one occasion and Wright's inability to locate the family friend or uncle who supposedly caused Ma.W.'s fractured femur, we hold that there was sufficient evidence to sustain Wright's convictions on these counts.

### C. Counts I and II: Neglect of M.W. and S.W.

█ Wright next contends that there was insufficient evidence to sustain his convictions for neglect of a dependent, stemming from the twins' apparent malnutrition, injuries, and overall dire medical condition, for which he had not sought any medical attention. Wright argues that he believed he did not have medical insurance, and therefore did not know that he was able to provide the medical care that the children needed. As such, he concludes, there is insufficient evidence to show that he knowingly or intentionally placed the children in a situation that might endanger their health.

According to Indiana Code section 35–46–1–4,

(a) A person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally:

(1) places the dependent in a situation that endangers the dependent's life or health . . .

* * * *

commits neglect of a dependent, a Class D felony.

(b) However, the offense is:

* * * *

(2) a Class B felony if it is committed under subsection (a)(1) . . . and results in serious bodily injury.

To be convicted of knowingly neglecting a dependent, the defendant must have been subjectively aware of a high probability that he placed the dependent in a dangerous situation. *Fout v. State*, 619 N.E.2d 311, 313 (Ind.Ct.App.1993).

· Wright contends that the only reason he did not take the twins to see a doctor was because he did not believe they had medical insurance and that they would be unable to receive medical treatment as a result. Wright's wife had received notice that their medical insurer was bankrupt, which is the reason that he believed they had no health insurance coverage. Wright admitted, however, that the notice of bankruptcy and a subsequent letter from the new insurance company instructed policyholders that if they continued to seek medical care as needed, they would be reimbursed. Tr. p. 590, 606–07.

█ As the State points out, the statute requires only that Wright have knowledge that the twins needed medical care. I.C. § 35–36–1–4. There is no exception in the penal code to permit a parent to avoid seeking medical attention for his children because he believes he does not have medical insurance.[3] Thus, the State needed to

---

**3.** Notwithstanding the fact that lack of insurance is not a defense and does not negate an element of the crime, the trial court was free to find that Wright's testimony lacked credibility. His wife worked for the United States Postal Service, which provides health insurance to its employees. Tr. p. 589–90. Moreover, he made a down payment of approximately $1,000 on a Mercedes Benz automobile just days before the twins were hospitalized in September 2001. He did not call a doctor, he did not visit the emergency

prove only that Wright knew that his children needed medical care and failed to take action. *See Brown v. State,* 770 N.E.2d 275, 281 (Ind.2002) (affirming neglect conviction where evidence demonstrated that the defendant knew her child needed medical treatment and failed to provide it, instead attempting therapy at home).

■ Wright acknowledged in his testimony that he knew that M.W. needed medical care and that he did not attempt to provide her with such care. Even though he never directly admitted that he knew that S.W. similarly needed medical care, " '[w]hen there are symptoms from which the average layperson would have detected a serious problem necessitating medical attention, *it is reasonable for the jury to infer that the defendant knowingly neglected the dependent.*' " *Lush v. State,* 783 N.E.2d 1191, 1197 (Ind.Ct.App.2003) (quoting *Mitchell v. State,* 726 N.E.2d 1228, 1240 (Ind.2000)) (emphasis in original). Our review of the record reveals sufficient evidence to conclude that it was obvious and apparent to any reasonable layperson that the twins were in dire need of medical assistance. Wright's sister-in-law knew immediately that the twins needed medical care and called law enforcement officials to help. Additionally, the police officers who first found the children immediately called an ambulance upon observing the twins, and one of them observed at trial that their condition was a "jaw dropper." Tr. p. 53–54.

Dr. Roberta Hibbard, a doctor with specialized training in child abuse who was the twins' attending pediatrician in the hospital, testified as follows: the twins exhibited significant malnutrition; M.W.'s arms and legs showed almost no subcutaneous fat tissue; she had an extremely large head, was very thin, and had very little spontaneous movement; M.W. was unable to roll over or sit up, would not smile, and was unable to interact with others; M.W. and S.W. each weighed approximately 10 pounds, while a normal six- to seven-month-old infant should weigh approximately 16 pounds; M.W. and S.W. each had the body of a two-month-old infant and the developmental skills of a newborn; S.W. had very thin arms and legs and his ribs were sticking out; he had a very large head and "sunsetting" eyes; he did not smile, moved very little, and had a body that was consistent with a newborn. *Id.* at 355, 364–82, 386–90.

There is overwhelming evidence to conclude that Wright knew that the twins needed medical care. His argument that he did not seek that help because he did not have medical insurance is irrelevant, unpersuasive, and chilling. His neglect is "so shocking that customary words of legal analysis seem inadequate to the task." *Brown,* 770 N.E.2d at 281. We hold that there is more than sufficient evidence to sustain Wright's convictions on neglect of a dependent.

## II. Sentencing

Wright next argues that he was improperly sentenced. Specifically, he contends that the trial court improperly: (1) weighed aggravating and mitigating factors; (2) imposed consecutive sentences; and (3) imposed a sentence that is inappropriate in light of the nature of the offense and character of the offender

### A. Aggravating and Mitigating Circumstances

■ As we consider Wright's argument that the trial court improperly weighed aggravating and mitigating circumstances, we note that, as a general rule, sentencing decisions are within the

room, and he did not call his Aunt Gladys, who is a registered nurse.

discretion of the trial court. *Echols v. State*, 722 N.E.2d 805, 808 (Ind.2000). When the trial court imposes a sentence other than the presumptive sentence, it must identify: (1) all significant aggravating and mitigating circumstances; (2) the reasons that led the court to find the existence of each circumstance; and (3) the court's evaluation and balancing of those aggravating and mitigating factors. *Bretz v. State*, 701 N.E.2d 1251, 1252 (Ind.Ct. App.1998). In reviewing an enhanced sentence, this court examines both the written sentencing order and the trial court's comments at the sentencing hearing to determine whether the trial court adequately explained its reasons for enhancing the sentence. *Davies v. State*, 730 N.E.2d 726, 741 (Ind.Ct.App.2000), *trans. denied, cert. denied*.

 The nature and circumstances of the crime is an appropriate aggravating circumstance. Moreover, facts indicating the particular brutality of the resulting injuries may be considered as an aggravating circumstance when sentencing a defendant, even where bodily injury is an element of the crime. *Bailey v. State*, 763 N.E.2d 998, 1004 (Ind.2002) (finding that the particular brutality of an attack may be considered when sentencing for battery).

 The finding of mitigating factors is within the trial court's discretion. *Newsome v. State*, 797 N.E.2d 293, 301 (Ind.Ct.App.2003), *trans. denied*. Moreover, the trial court is not required to give the same weight to mitigating factors as does the defendant. *Id.* In particular, a trial court may properly conclude that a defendant's lack of a criminal record is not entitled to significant mitigating weight. *Sipple v. State*, 788 N.E.2d 473, 483 (Ind. Ct.App.2003), *trans. denied*.

Wright contends that the trial court's sentencing statement is deficient because it relies on improper aggravating factors and fails to consider and give due weight to the lone mitigating factor. Specifically, he argues that the sentencing statement does not state why each fact is aggravating, it merely recites facts pertaining to all of the counts as aggravating for Count I, and contains factual errors. In addition, Wright contends that the trial court failed to give due weight to his lack of a prior criminal history.

The State responds by pointing out that the trial court properly found the following aggravating circumstances: (1) the heinous nature and circumstances of the crimes; and (2) Wright's character. The trial court explained why it found the nature and circumstances of the crimes against the twins to be particularly heinous: (1) Wright was the children's primary caregiver; (2) the twins were clearly in a state of distress, as evidenced by their enlarged heads, thin bodies, and sick eyes; (3) Wright bound the babies in blankets with their arms behind their backs to prevent them from moving; (4) Wright attempted to isolate the children from family and friends; (5) only when Wright's sister-in-law observed the twins' grave condition did anyone call for help; (6) the children's medical condition was dire; (7) Wright failed to seek medical attention, resulting in the twins' brain damage and physical disabilities; and (8) at least two experts testified that this was the worst case of child abuse that they had ever observed. Tr. p. 677–80. As to the counts directed to Ma.W.'s injuries, the trial court found the nature and circumstances of the crime to be aggravating, highlighting the brutality of her injuries and her resulting emotional trauma. *Id.* at 680–81.

The trial court further explained why it considered Wright's character to be an aggravating factor: (1) Wright tortured his children; (2) he was dishonest in claim-

ing that they had no medical insurance; and (3) he spent approximately $1,000 on a new Mercedes Benz automobile rather than using it to provide his children with desperately needed medical care.

The record reveals that Wright, the primary caregiver for his four children, repeatedly and brutally battered at least three of them. He beat them not once, not twice, but a number of times, as shown by the gross number of fractures, some of which were healed or healing at the time of hospitalization. The condition of the twins was so obvious, dire, and wretched, that it was immediately apparent to a relative and to the police officers that the twins needed immediate hospitalization. As a result of Wright's cruelty and neglect, the children are suffering from physical disabilities and emotional trauma, some of which they will struggle with for the rest of their lives. Wright chose to spend $1,000 on a new car instead of on medical care for his children. In light of these factors, the trial court appropriately considered the nature and circumstances of the crime and Wright's character to be aggravating circumstances.

The trial court also considered Wright's lack of a criminal history to be a mitigating circumstance. Wright contends that this factor "could not have been accorded the significance it deserved when [the trial court] imposed consecutive sentences totaling forty-five years." Appellant's Br. p. 23. The trial court properly considered Wright's lack of a criminal history to be a mitigating factor. *See Sipple*, 788 N.E.2d at 483. But it was within the trial court's discretion to find that the aggravating factors outweighed the lone mitigating factor. The trial court did not abuse its discretion in imposing enhanced sentences on Wright.

### B. Consecutive Sentences

Wright argues that the trial court erred in ordering that three of his concurrent sentences should be served consecutively. Specifically, he avers that the trial court's reasons for imposing consecutive sentences are inadequate.

As we consider this argument, we note that the decision to impose consecutive sentences is generally within the trial court's discretion. *Archer v. State*, 689 N.E.2d 678, 683 (Ind.1997). Where the trial court imposes consecutive sentences not required by statute, a reviewing court will examine the record to ensure that the trial court explained its reasons for doing so. *Id.* The same aggravators may be used to support a consecutive sentence as are used to support an enhanced sentence. *Parrish v. State*, 515 N.E.2d 516, 521 (Ind. 1987). Moreover, the imposition of consecutive sentences is appropriate in cases involving multiple victims. *Bostick v. State*, 804 N.E.2d 218, 226 (Ind.Ct.App.2004). The trial court properly explained that its imposition of consecutive sentences was because of:

> The brutal, horrific and violent nature of the offense against [M.W.] Wright for the first seven months of her life, S.W. Wright for the first seven months of his life and Melissa [sic] Wright, the injuries that occurred to her, when she was seven weeks old. The numerous and multiple injuries to these three children is [sic] grounds for the Court to sentence these three counts consecutive [sic].

Tr. p. 681. The trial court explained its reasons for imposing consecutive sentences, and those reasons, in tandem with the fact that there were multiple victims, are sufficient to conclude that it acted within its discretion. We hold that the trial court properly imposed consecutive sentences on Wright.

### C. Nature of the Offense and Character of the Offender

As we consider Wright's argument that his sentence is inappropriate in light of the nature of his offense and character, we note that this court has the constitutional authority to revise a sentence if, after "due consideration" of the trial court's decision, we find that the sentence is inappropriate in light of the nature of the offense and the character of the offender. Ind.App. R. 7(B). This court's review under Appellate Rule 7(B) is "very deferential" to the trial court's decision. *Martin v. State*, 784 N.E.2d 997, 1013 (Ind. Ct.App.2003).

The State points out that after finding that the aggravating circumstances outweighed the mitigating circumstance, the trial court sentenced Wright to fifteen years for each class B felony, ordering three of the sentences to be served consecutively. A trial court is permitted to sentence a defendant to a maximum of twenty years on a class B felony pursuant to the relevant statute. *See* Ind.Code § 35–50–2–5. Thus, Wright could have received sixty years on consecutive counts.

The evidence presented at trial revealed a chilling and horrific pattern of abuse. Wright twisted five-month-old Ma.W.'s leg hard enough that he broke her femur, also squeezing or shaking her hard enough to break her ribs on more than one occasion. After having more children, Wright inflicted similar—arguably worse, though it is difficult to weigh such atrocities—torture on his twin babies. He broke their ribs, fractured a sickening number of bones in their infant bodies, failed to feed, nurture, and care for them, bound their bodies in blankets with one arm permanently strapped behind their backs to prevent them from moving their arms and legs, and watched as the size of their heads grew abnormally and the size of their bod-

ies shrunk alarmingly. After committing these acts, he attempted to excuse his failure to seek medical care by claiming that he did not have medical insurance. But rather than spending $1000 on sorely needed medical assistance for his babies, he chose to make a down payment on a new automobile.

This litany of brutal acts and the extent and severity of the children's injuries more than justify the trial court's imposition of enhanced and consecutive sentences. This sentence is entirely appropriate in light of the nature of the offense and character of the offender.

The judgment of the trial court is affirmed.

SHARPNACK, J., and FRIEDLANDER, J., concur.