# FOR PUBLICATION



FILED
Sep 11 2012, 9:08 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MARK SMALL**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**RYAN D. JOHANNINGSMEIER**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

BRITTANY L. MCCONNIEL,               )
                                     )
    Appellant-Defendant,         )
                                     )
        vs.                 )     No. 18A02-1108-CR-733
                                     )
STATE OF INDIANA,                    )
                                     )
    Appellee-Plaintiff.          )

APPEAL FROM THE DELAWARE CIRCUIT COURT
The Honorable Thomas A. Cannon, Jr., Judge
Cause No. 18C05-1006-FA-8

**September 11, 2012**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

Brittany L. McConniel ("McConniel") appeals her conviction and sentence for neglect of a dependent as a class A felony.[1] McConniel raises three issues, which we revise and restate as:

I.    Whether the court abused its discretion in denying McConniel's Motion for Funds for Expert Witness;

II.   Whether the evidence is sufficient to sustain McConniel's conviction; and

III.  Whether McConniel's sentence is inappropriate in light of the nature of the offense and her character.

We affirm.

FACTS

The relevant facts follow. Ryan McConniel and Amber Huggins were married in May 2000, lived in Indiana, and had two daughters together, K.M., who was born on September 11, 2000, and Lauren, who was born on October 3, 2004. Ryan and Amber separated in July 2006, and Amber moved to Tennessee with K.M. and Lauren. At some point, Ryan moved to Arkansas.

Ryan filed for divorce in November 2006, and the divorce was final in May 2007. The court awarded custody of K.M. and Lauren to Ryan and ordered Amber to pay Ryan child support of $104 per week. However, Ryan and Amber agreed that Amber would not pay the support because Lauren would stay with Amber and K.M. would stay with Ryan, and Ryan did not expect the support order to be enforced.

In October 2007, Ryan married McConniel, who worked as a certified nursing assistant and who had a one-year-old son, K., at the time of the marriage. McConniel

---

[1] Ind. Code § 35-46-1-4 (Supp. 2007) (subsequently amended by Pub. L. 6-2012, § 227 (eff. Feb. 22, 2012)).

was the stepdaughter of Ryan's cousin Robert Lee. Ryan and McConniel had one daughter together, H.M. After McConniel and Ryan were married, McConniel expressed her desire that Ryan enforce the child support order against Amber so that McConniel and Ryan could obtain the weekly support money.

Lauren continued to stay with Amber until December 2007 and then went to stay with Ryan and McConniel from December 2007 until June 2008. In June 2008, K.M. and Lauren went to stay with Amber, and six weeks later K.M. returned to Arkansas to live with Ryan. While living with Amber, Lauren was a healthy child, she had "chipmunk cheeks," curly hair, long fingernails, was potty-trained, had no problems sleeping, and was very outgoing, talkative, and very well behaved. Transcript at 85. Lauren had no problems eating or gaining weight and did not exhibit any odd behavior, including smearing feces on people, eating out of the garbage, or hitting herself. In October 2008, Lauren went to Arkansas to stay with Ryan and McConniel, and she returned to live with Amber on December 27, 2008.

On December 27, 2008, Amber picked up Lauren and K.M. from Ryan and McConniel at a gas station in Arkansas. Amber noticed that Lauren had bruises along her forehead and a couple on her cheek. The following morning, Amber also noticed that Lauren had bruising on her arm, on her leg, and on her lower back and that Lauren was more withdrawn. Lauren had also reverted to peeing in her pants. Amber called child protective services. At some point, Ryan called Amber and asked if she had called CPS, and Amber responded affirmatively. Ryan asked Amber if she would keep Lauren for a while, Amber said yes and asked how long was "a while," and Ryan said "like forever."

Id. at 90. Ryan also informed Amber that he and McConniel planned to move to Indiana. Within a couple of weeks of picking up Lauren in December 2008, Amber had Lauren returned to being potty-trained.

McConniel, Ryan, K.M., K., and H.M. moved to Winchester, Indiana, in March 2009 and stayed with McConniel's uncle, Tony Rice, as well as with Robert Lee, Angela Lee, Samra Lee, and Tony's children. Prior to moving in with Robert, McConniel informed Ryan that Robert had molested her as a child. Approximately three or four months later, Ryan, McConniel, Robert, Angela, K.M., K., and H.M. moved to Farmland, Indiana. While living in Farmland, McConniel asked Ryan why he did not want to go pick up Lauren in Tennessee, and Ryan was told that he "was a worthless piece of crap father if [he] didn't go get [his] daughter." Id. at 188. Ryan did not have any concerns about Lauren and desired that Lauren remain in Amber's care.

One day, after Ryan returned home from work, McConniel told Ryan that she had called a 911 center in Tennessee to "have a welfare check on Lauren" and stated she had explained that Ryan "was the custodial parent and that Amber would not give [Ryan and McConniel] the child back." Id. Ryan knew that McConniel's statements to the 911 center were untrue. McConniel pressured Ryan to take Lauren because they needed the money and stated that Ryan was a worthless father for leaving his daughter with Amber, didn't love her, and if he was any kind of father he would go pick her up.

On August 20, 2009, Ryan and McConniel drove to Tennessee with the custody order, met with the local police, and went to Amber's house together with two law enforcement officers. Ryan did not inform Amber that he planned to take Lauren, and

4

the visit was a complete surprise to Amber. Amber was given an address for Ryan which was the house at which Ryan had lived in Winchester, Indiana.[2] At the time Lauren was picked up by Ryan and McConniel, she was healthy, potty-trained, outgoing, energetic, and was eating fine. Ryan then initiated an action for back payment of child support from May 2007.

Approximately two months later, which was about three or four months after moving to Farmland, Indiana, Ryan, McConniel, Robert, Angela, K.M., K., H.M. and Lauren moved to Muncie, Indiana. Amber did not know where Ryan and McConniel were living with Lauren and was not given a phone number for Ryan or McConniel. At some point, Amber called a phone number for McConniel's sister in an attempt to reach K.M. and Lauren and spoke with McConniel's sister and later McConniel, and McConniel told Amber to pay child support and not to call the number anymore. Amber also attempted to contact Ryan through a social network site. McConniel responded to Amber's messages and stated that when K.M. and Lauren were old enough to decide if they wanted to see Amber then they could make that decision. Amber asked for an address and telephone number, but she was told only that they lived in Winchester. In December 2009, Amber sent Ryan a message and told him to have her daughters call her or that she was going to seek contempt charges. Amber received a call from a restricted number and was able to speak with K.M. and then Lauren. The call lasted a little over

---

[2] Ryan testified that he did not provide a correct address to Amber and that McConniel had told him that she did not want Amber and others to know that they were staying with Robert and Angela. When asked why he lied about the fact that he was living with Robert, Ryan testified that "it was easier to go along with what [McConniel] wanted than to pay the consequences of not doing it later" and that "[i]t would have been a fight." Transcript at 244.

5

eight minutes and ended when Amber heard McConniel say "you've talked long enough" and heard a click.  Id. at 100.  Lauren and K.M. addressed Amber by her name rather than "mama" as they had previously.  Id. at 101.

At some point, Ryan began working at a company in Muncie from 7:00 a.m. to 3:30 p.m. and usually drove a minivan to work but would take public transportation if McConniel needed the minivan during the day.[3]  McConniel did not work.  On November 19, 2009, McConniel took Lauren to an emergency room due to a red and painful eye.  At that time, Lauren weighed thirty-eight pounds and there were no concerns with her vital signs.  McConniel reported that Lauren's primary physician was Dr. Shoemaker and that she was insured by the Medicaid Indiana Traditional Program.  The emergency room physician wrote prescriptions for some antibiotic eye drops and also Benadryl to ease Lauren's discomfort, and the physician did not indicate that the Benadryl could be used every night to assist with Lauren falling asleep.  The physician noted that Lauren did not have other physical problems and did not note any mental issues.

In December 2009, Lauren began calling "people a f------ b----," words that Robert would "say [] all the time."  Id. at 271-272.  Also in December, Lauren's behavior changed in that she began "smearing poop on stuff" such as the refrigerator, the television, and the floor.  Id. at 272.  Lauren also began to see "little blue bunnies that told her to do bad things."  Id.

On December 8, 2009, McConniel took Lauren to an emergency room in Muncie and reported that Lauren had jumped off of a bed and injured a finger on her right hand.

_____

[3] Ryan later testified that, at the time, he believed that McConniel was taking Lauren to doctor and dentist appointments but later discovered that McConniel had never taken Lauren to those appointments.  McConniel did take the other children to their doctor and dentist appointments.

Lauren's primary care physician was reported as Dr. Shoemaker. An x-ray revealed that Lauren suffered a buckle fracture of her middle finger and also that Lauren had additional fractures in four fingers on her right hand.

In mid-December, 2009, McConniel, Ryan, Robert, and Angela took Lauren, K.M., and K. to a church Christmas party, and after arriving in the church parking lot Lauren would not exit the minivan and repeatedly said "f------ b----." Id. at 274. Ryan asked a pastor at the church for help, and the pastor observed that Lauren was physically rocking back and forth in her carseat and repeatedly said "f------ b-----" for about five minutes. Id. at 507. The pastor spoke with Ryan and McConniel and stated that he "really [thought] that [Lauren] needs to see a child psychologist very soon." Id. at 508. Robert eventually took Lauren inside the church to the party, and the pastor noted that Lauren "stood off to the side and just starred [sic] more or less," did not interact with any of the other children, and seemed very pale and frail. Id. at 509.

Ryan observed Lauren being abused on numerous occasions. He observed Lauren being hit by McConniel and Robert on her palms and on the bottom of her feet with a wooden stick. At first, Lauren was hit on the back of the hands, but then Robert "said if you hit her on the back of her hand it will break a bone so hit her on the palms." Id. at 261. Ryan mostly saw McConniel hit the bottom of Lauren's feet. The stick was made from two wooden side railing pieces of a baby crib that had been taped together. Ryan considered the hitting of Lauren to be abusive and argued with McConniel about it. At some point, Ryan threw the stick away, but McConniel made another one. When Ryan

7

asked McConniel why she hit Lauren with the stick the way that she did, McConniel responded "[b]ecause that is the only way she will feel pain." Id. at 265.

Immediately after Lauren had "been beat on the bottom of her feet," she was forced to do jumping jacks for about five to ten minutes while McConniel or Robert kept track of time. Id. at 264. Lauren was forced to jump until she vomited. If Lauren quit, she was forced to start over and jump for another ten minutes. Lauren was forced to jump for fifty minutes on one occasion and twenty to thirty minutes on another occasion. While she was jumping, Lauren would cry and ask to stop, and McConniel would tap the stick and tell Lauren not to stop.

McConniel and Robert forced Lauren to run repeatedly from the couch to the refrigerator. Lauren would cry and ask if she could stop, and McConniel would say "No, you have another minute to go." Id. at 248.

On several occasions, and several times a night, McConniel forced Lauren to hold heavy objects such as a heavy book or canned goods out to her sides or in front of her for sixty to seventy seconds while McConniel would count. If Lauren stopped or dropped the object, McConniel forced her to start over. When Ryan confronted McConniel about her treatment of Lauren, McConniel stated that Lauren "needs to start being good or I'll break her." Id. at 255.

Lauren was also hit with wet rags or hand towels on the back of her legs by McConniel and Robert. Ryan asked why wet rags were used on Lauren, and Robert said that he "had seen it on . . . Criminal Minds and that it wouldn't leave any bruising." Id. at 257. Robert told Ryan not to tell anyone about Lauren's punishments. Ryan asked

8

McConniel why she hit Lauren, and McConniel stated again that Lauren "is bad" and "I'll break her." Id. at 258. McConniel told Ryan that "if [he] told she would take [his] children away from [him] and [he] would never see them again" because she "had something that Amber wanted," which was Lauren. Id. The other children were never punished the way that Lauren was punished.

On one occasion, McConniel struck Lauren on the bottom of her feet with the stick and allowed K. to punch Lauren in the face. Ryan told McConniel to put an end to striking Lauren and went to the house of his uncle Ronald Shreves, which was next door to the residence, for help, and Ronald had a heated argument with McConniel and then left.

McConniel would force feed Lauren by making Lauren stand in front of her and eat. Lauren would become sick and vomit due to the forced feeding. When Lauren vomited, McConniel hit the bottom of Lauren's feet with the stick and forced her to do more jumping jacks, which caused Lauren to vomit again. Each night, McConniel forced Lauren to take Benadryl so that she would sleep.

In late December, Ryan returned home from work and Lauren would have her hand full of feces and would try to wipe it on him. Lauren also tried to smear feces on the other children. McConniel told Ryan that she was going to call Dr. Shoemaker for an appointment for Lauren and that she needed the van, and Ryan was under the impression that McConniel was taking Lauren to the doctor.

In January 2010, Ryan began to take classes at Ivy Tech, and he would be home from work at about 3:45 p.m. for forty-five minutes and then be away from home until

9

about 9:15 or 9:30 p.m. When Ryan returned home, the children were already in bed. Near the end of January, Amber traveled from Tennessee to Indiana and attempted to find her daughters. Amber visited the address in Winchester, Indiana, which she had been given when Ryan and McConniel took Lauren, and she discovered that the house was empty.

Ronald, Ryan's uncle who lived next door, observed that Lauren's health deteriorated and that her demeanor changed in December 2009 and through January 2010. Ronald noticed that Lauren had been very tender and happy when the family first moved to Muncie but that she began to swear, demonstrated noticeable behavior changes, and began to lose weight. Ryan told Ronald that Lauren had an eating disorder and that there was "a prescription they was supposed to get for her or somethin'." Id. at 466. Ronald noticed that Lauren's condition further deteriorated in January 2010. Lauren would not run, would not hug him, did not smile, did not seem happy, and seemed thinner. Ronald noticed that "this all [was] completely opposite" of what he had observed about Lauren in August or September 2009 and that it was obvious that Lauren needed medical attention. Id. at 471. Nearly every time Ronald visited McConniel's residence, Lauren would be in the basement where she slept on a mattress and would not come upstairs, and one time Ronald went into the basement and Lauren told him that she was not allowed to come upstairs. McConniel told Ronald that she had taken Lauren to a doctor, that the doctor stated that Lauren had mental issues and referred Lauren to a therapist, and that McConniel had taken Lauren to the therapist.

One day when Ryan came home from work, McConniel told him that "Lauren looked like a hermaphrodite," and Ryan agreed to take Lauren to a doctor. Id. at 286. On February 4, 2010, Ryan and McConniel took Lauren to an urgent care clinic and, because Ryan was embarrassed that Lauren might be a hermaphrodite, reported that Lauren complained of pain when she urinated and that her "vaginal area doesn't look normal." Id. at 620. Ryan and McConniel reported that Lauren had been potty-trained but had regressed into diapers and that Dr. Shoemaker was Lauren's primary care physician. Lauren was listed as a Medicaid patient at the time of admission. Tests revealed that Lauren did not have a urinary tract infection, and an external vaginal exam did not indicate anything that would suggest that Lauren was not a normal female. After the exam, Lauren retracted into a defensive position, curled up her arms, moved to the top of the examination table, and began to hit herself in the forehead with her fists. Ryan and McConniel reported that Lauren hit herself hard enough to cause facial bruises. Ryan and McConniel were referred to Meridian Services due to Lauren's behavior and were provided information to follow up with Dr. Shoemaker.

On February 10, 2010, McConniel and Ryan took Lauren to Meridian Services for an intake appointment and met with Karen Royer, a child and family therapist. Lauren appeared very small for her age, wore her coat during the entire session, was very quiet, and slept for most of the session. McConniel "did most of the talking" and presented herself as Lauren's primary caregiver. Id. at 848. Dr. Shoemaker was identified as Lauren's primary physician. McConniel reported that Lauren was not eating or sleeping well, was smearing feces on things, was seeing little blue rabbits which were telling her

11

to do bad things, would not interact with anyone, would stand for hours and not move, and would eat things out of the trash. McConniel further reported that Lauren had hidden a knife or a sharp object under her mattress and had threatened to hurt someone with the knife. McConniel also reported that Lauren exhibited sexual behavior and would "stick [a] Barbie doll way up inside her." Id. at 851. McConniel stated that she was concerned about "parent safety and the safety of the other children" in the home because of Lauren's threats. Id. When asked who lived in the home with Lauren, McConniel reported that she, Ryan, and three siblings lived in the home but did not report that Robert or Angela lived in the home. McConniel indicated that Amber had abused Lauren in Tennessee.

On February 11, 2010, Royer reported to CPS in Indiana that Lauren may be a victim of child abuse because she demonstrated some of the classic symptoms of abuse. Indiana CPS case worker Kelli Louck received the report and referred the allegations to CPS in Tennessee.

Sometime in February 2010, Ryan asked McConniel to call the doctor due to Lauren's weight loss. The following day, McConniel told Ryan that she had called the doctor and the doctor said "don't worry about it, she's not going to starve herself." Id. at 284. McConniel also told Ryan that Royer "had ordered her a dietician," which was not true. Id. at 285.

Also, sometime after Christmas Day in 2009, Linda Smith, Robert's mother, visited the residence where McConniel lived in Muncie. Smith asked Lauren if everything was okay, and Lauren responded affirmatively, but Smith thought it was unusual that Lauren was so quiet and did not talk very much because she had always been

12

so talkative. On February 15, 2010, Smith again visited the Muncie residence. At some point during the visit, McConniel took Lauren into the bathroom. Later, Smith went into the bathroom and attempted to play "peek-a-boo" with Lauren with the shower curtain, and Smith noticed that Lauren did not play, was standing in the shower with her arms up, and was shaking. Id. at 444. Smith "thought what the heck" and put her hand in the water and discovered "the water was ice cold." Id. Smith turned off the water and wrapped Lauren in a towel, and Lauren went and sat down by a heater vent on the floor. Smith asked McConniel about the cold shower, and McConniel told her that Lauren was used to cold showers because she took them when she was with Amber.

Smith also had a conversation with McConniel about Lauren's weight. Smith was upset because Lauren "looked horrible" and "looked like she had lost twenty (20) pounds and the child couldn't afford to lose one (1)." Id. at 446. McConniel told Smith that she had taken Lauren to the doctor and that the doctor stated that Lauren had anorexia. Smith expressed disbelief that Lauren was an anorexic as a five-year-old, and McConniel stated that Lauren had seen the doctor, was taking medicine, and was seeing a psychiatrist. Smith also observed that McConniel "wasn't nice to" Lauren and that Lauren was "always grounded." Id. at 447. After Smith had surgery on her knee Lauren was "always downstairs and [Smith] couldn't get down there." Id. Smith observed that McConniel treated Lauren drastically different than the other children, that McConniel showed no love or affection for Lauren, and that McConniel forced Lauren to call her "mommy" and that Lauren was "afraid not to." Id. at 448. Smith observed K. kick a door on purpose so that it smashed Lauren's fingers and complained to McConniel, McConniel stated that it

13

was an accident, Smith stated it was not an accident because she had just watched the incident, and McConniel "said well [K.] I guess I'm going to have to spank you [K.] because everybody is mad at me" and "swatted him on the butt and he laughed at her and that was it." Id. at 449. Smith noted that Lauren was constantly in trouble, that McConniel was more strict with Lauren than the other children, that McConniel wanted Lauren to be tougher, and that McConniel "dominates Ryan." Id. at 451.

On February 22, 2010, Ryan contacted Royer and informed her that Lauren's behaviors were escalating and that Lauren "had acquired a pair of scissors and threatened to harm somebody." Id. at 855. Lauren was taken to a session with Royer, and Royer met with Lauren alone and then together with McConniel and Ryan. Royer noted that Lauren was very withdrawn, that it was difficult to have a conversation with her, that Lauren showed no emotion whatsoever, and that she was a very unhappy and miserable child. Lauren drew a picture of the blue bunny that told her to do bad things. Lauren stated that she slept on the floor or on a cot next to her bed because her bed was frequently dirty. Lauren also stated that Amber had forced her to take cold showers or would bend her fingers back as punishment. Royer informed Ryan and McConniel about possible follow up care, and they did not express an interest. Royer scheduled a follow up visit for March 1.

At the March 1, 2010 appointment, Lauren wore her coat and slept for most of the session. Lauren had physically deteriorated during the previous week, had dark circles under her eyes, and looked pale. Lauren "looked exhausted, and frail, and fragile" and "like a child who wasn't eating and wasn't sleeping." Id. at 866-867. McConniel

14

reported that Lauren was having difficulty eating and that she would sometimes vomit food back up. McConniel told Royer that it was not unusual for Lauren to sleep only two or three hours a night. Royer told McConniel that there might be a need to admit Lauren into a hospital because her health seemed to be deteriorating. McConniel did not ask about further treatment.

On March 2, 2010, Royer contacted a local pediatrician and obtained information regarding the process to have Lauren referred to the pediatrician and then called McConniel and explained the procedure and what steps needed to be taken.

Also on March 2, 2010, Louck, with CPS in Indiana, contacted the police department and scheduled an interview of K.M. and Lauren for March 3, 2010, in response to receiving information from CPS in Tennessee that it intended to conduct an investigation into the previous abuse allegations. Louck attempted to call McConniel to inform her of the interview, Angela answered the phone, and Louck informed Angela of the interview.

Between 11:00 and 11:30 a.m. on the same day, Ryan called McConniel during his lunch and McConniel stated that Lauren had fallen at the dentist's office and was going to have a black eye. Ryan asked "who hit her," and McConniel became angry, stated that no one hit Lauren, and hung up. Id. at 291. At about 1:30 p.m., McConniel called Ryan at work and told him that they needed to take Lauren to the hospital because Lauren was holding her head and "was screaming of a headache." Id. Ryan told McConniel to come to his workplace. When McConniel and Lauren arrived at Ryan's workplace, Lauren was holding her head and screaming, and Ryan went inside and called for an ambulance.

15

Paramedics arrived and placed Lauren in the ambulance to take her to Ball Memorial Hospital. McConniel rode in the ambulance, and Ryan drove the van to the hospital. One of the paramedics noted that Lauren appeared "emaciated," was "all skin and bones," was "sunken in face," and that her condition, especially based on the exposed face and extremities, was obvious. Id. at 776. Paramedics noted that Lauren had an abrasion by her left eye and some bruising of the bridge of her nose and below her left eye. The paramedic noted that the bruises were not "as fresh as what it should have been for . . . a fall earlier, in the day." Id. at 777. The paramedic asked McConniel about the bruising, and McConniel stated that Lauren hits herself when she becomes angry. McConniel did not attempt to comfort Lauren, and the paramedic noted that McConniel was "[a] little distant" and "[n]ot quite as emotional as I would expect." Id. at 778. At the hospital, the paramedic informed the nurse of Lauren's "wasted state" and that McConniel had said that the child refused to eat because he wanted to prepare the nurse for "what she was about to see" as Lauren "was very, very, something that you don't expect to see here in America, as far as nourishment, or physical condition, or anything." Id. at 781.

The nurse at the hospital noted Lauren appeared "awful" and "looked severely emaciated, and pale, and she whined or cried most of the time she was in [the nurse's] care." Id. at 794. The nurse noted that she saw Lauren's ribs and small wrists and that she had "never seen anything like it." Id. at 795. The nurse noted that the bruises under Lauren's eye, lower legs, and arms were "old bruises," that her lips were cracked, and that her hair was thin. Id. The nurse spoke with McConniel about Lauren's condition,

16

and McConniel stated that Lauren had been treated by Dr. Shoemaker the previous week and that Dr. Shoemaker was aware of Lauren's emaciated condition. At some point, Lauren had a bowel movement, McConniel found the nurse and stated that Lauren needed to be cleaned up, and then exited the hospital. The nurse found McConniel's behavior peculiar because McConniel's demeanor was "disgusted" and that she "seemed to be annoyed by Lauren." Id. at 803-804. Lauren was discharged from the hospital at approximately 5:00 p.m., and McConniel and Ryan were given specific instructions to bring Lauren back to the hospital if she displayed certain conditions during the night.

At approximately 6:35 p.m. on March 2, 2010, McConniel returned Louck's call and stated that Lauren had fallen earlier in the day at a dentist visit, had hit her head on the concrete, that she had been taken to a hospital, and that the hospital had released her. McConniel also stated that as long as everything was okay, the children would be at the interview scheduled for the following day, March 3, 2010.

After leaving the hospital, Ryan took McConniel and Lauren back to their residence and then went to Ivy Tech. About two hours later, while Ryan was in a computer lab, McConniel contacted Ryan by Facebook and stated that Lauren was not doing any better and that Lauren "was suffering a mental breakdown." Id. at 302. Ryan returned home and left a voice message for Royer, called "several mental hospitals trying to get Lauren to get evaluated," and obtained an appointment at a psychiatric hospital in Greenwood, Indiana. Id. Ryan drove to Greenwood with McConniel and Lauren, which took two hours. At the psychiatric hospital, Ryan and McConniel were given directions

17

to Riley Children's Hospital because Lauren's condition was medical, and Ryan drove to Riley Hospital with McConniel and Lauren, which took forty-five minutes.

When Lauren arrived at the emergency room at Riley Hospital at approximately 12:55 a.m. on March 3, 2010, she was "malnourished," "emaciated," "dehydrated and . . . extremely lethargic." Id. at 702. Lauren weighed twenty-eight pounds. Lauren's weight for her age was very low, her bones, ribs, and clavicle were pressing against her skin, her cheekbones were very prominent which is not typical for a child of five years old, and Lauren had little or no subcutaneous fat under her skin. When Lauren cried, she did not have any tears, the mucus membranes in her mouth were dry, and the capillary refill on the tips of her fingers was delayed, all of which indicated that Lauren was dehydrated. Lauren had multiple bruises on her face and extremities and a laceration on her thigh. Doctors determined Lauren's sodium level was at an "extremely high" level. Id. at 708, 933. The emergency room physician gave Lauren a clinical diagnosis of failure to thrive and "severe dehydration and hypernatremia which is high sodium and altered mental status," which was deduced from Lauren's score of nine of fifteen using the Glascow Coma Scale, which is used to monitor a child's neurological status including verbal and motor responses and responses to painful stimuli. Id. at 708.

One of Lauren's treating physicians in the pediatric intensive care units noted that Lauren was extremely ill, "shockingly underweight" and almost "skin and bones." Id. at 923. Lauren's blood pressure was very low and "she was seizing." Id. at 924. Lauren was unresponsive, had been put on a ventilator, and had bruises covering her body which

were at various stages of healing.  The physician recognized Lauren was a "very ill child who was very close to death, probably was going to die . . . ."  Id. at 925.

Dr. Andrea Weist spoke with Ryan and McConniel to figure out what had happened.  During their conversation, Dr. Weist asked for the name of Lauren's primary physician, and Ryan and McConniel stated that the doctor's name was Aaron Shoemaker.  Dr. Weist noted that Dr. Shoemaker had done his residency at Riley, that she knew him, and that she would be calling him which is procedure when a person is admitted who is critically ill.  Upon hearing that Dr. Weist planned to call Dr. Shoemaker, the demeanor of Ryan and McConniel changed and they stated that actually Dr. Shoemaker had not seen Lauren.  Dr. Weist realized "that something was horribly wrong" as Lauren's state of malnutrition was not a recent event but "was an ongoing issue."  Id. at 927.  Neither Dr. Shoemaker nor anyone in his physicians' network had ever seen or treated Lauren, and no appointment had ever been scheduled by his physicians' network for Lauren.  However, K. and H.M. had been previously seen or treated by Dr. Shoemaker or his partners in his physicians' group.

Lauren was unable to breathe effectively on her own due to seizing, which was recurrent and dangerous.  Dr. Weist reviewed results of testing of Lauren related to fluids and nutrition and suspected that there had been "exogenous sodium intake," which is salt that the body has been given and has not needed.  Id. at 931.  Dr. Weist noted that "[t]he biggest issue besides the sodium level . . . was [Lauren's] malnutrition."  Id. at 933.

Although certain medical conditions can cause high levels of sodium, none of those conditions were present in Lauren.  Dr. Weist consulted with various colleagues in

19

an attempt to determine the cause of Lauren's high sodium level, including a kidney specialist, a metabolism doctor, and an endocrine doctor. Lauren's physicians were unable to find a reason for Lauren's high sodium level and "[t]hey all believed it was forcible salt intake or somehow taken in a lot of salt." Id. at 935. The physicians were also able to see pictures of Lauren when she was in Amber's care and was happy and healthy. Lauren's high sodium levels suggested that Lauren had ingested table salt. McConniel and Ryan were specifically asked if Lauren had any access to salt in the home and whether they had seen Lauren ingest salt, and McConniel and Ryan stated that there was only one salt shaker in their house, that the shaker was kept up in a cabinet above the microwave, and that there was no possible way that Lauren could have reached it.

Dr. Weist noted that the fact that Lauren as a five-year-old child was seizing was very shocking, that Lauren was seizing "because of her malnutrition," and that once Lauren's body was stressed enough it "just could not . . . handle it anymore." Id. at 937. Another doctor noted that, based upon her condition, Lauren must have had inadequate caloric intake for a period of months.

A relative of Ryan called Amber to inform her that Lauren had been admitted to Riley Children's Hostpial, and Amber drove to Indiana together with her husband and mother. When Amber saw Lauren, she noticed that Lauren's body had "no meat on her bones, her cheeks were sunk in, her hair was chopped off . . . [h]er foot was black, her hands were swollen, and you could see the outlines of her bones." Id. at 105. McConniel and Ryan were not in the room when Amber arrived, and Amber stayed in the room until Lauren died. McConniel came into the room every six or seven hours.

Three of Lauren's treating doctors held "an extremely high level of concern of abuse and neglect" of Lauren. Id. at 946. Dr. Weist believed that it was obvious that Lauren's symptoms and condition required immediate medical attention and that Lauren's caregivers obviously should have sought medical treatment much earlier.

At approximately 8:45 a.m. on March 3, 2010, McConniel called Louck and stated that after they went home from the hospital the previous evening Lauren had begun to exhibit some "odd behaviors," that McConniel and Ryan had contacted Royer, and that they were referred to the psychiatric hospital in Greenwood and later to Riley Child's Hospital. Id. at 1116.

On March 4, 2010, Lauren was nonresponsive, had developed multi-organ failure, and was likely brain dead. A pastor at the hospital noticed that, after McConniel and Ryan exited Lauren's room after she had been taken off of the ventilator and went downstairs at the hospital, McConniel and her family's demeanor was of a sense of relief. A nurse observed that, as McConniel and her family were exiting an elevator on the first floor of the hospital, they were laughing, talking, and interacting, which was quite different than they acted on the second floor less than three minutes earlier, and that McConniel was laughing and acting happy. A few days later, Ryan overheard McConniel state to Robert that "they don't have nothing . . . they can't prove anything." Id. at 309.

A subsequent search of McConniel's residence uncovered two partially-filled twenty-six ounce containers of salt, one full container of salt, and a large glass jar with holes poked in the top lid that contained salt.

21

Following an autopsy, the coroner found the manner of Lauren's death to be undetermined. The coroner further found the cause of Lauren's death to be "[c]omplications of hypernatremia, or high sodium" and "non-organic failure to thrive" or malnourishment as the contributing cause. Id. at 1150. The coroner believed that Lauren's malnourishment and malabsorption, the fact that she was not adequately taking in fluid and was eating poorly, contributed to Lauren's death and could have caused Lauren's salt level in her blood to rise. During an interview with police on March 9, 2010, McConniel stated that Lauren's therapist had told her that she had read an article which reported that a mother was going to be charged in connection with her daughter's high sodium level but that "then she was found not guilty because they didn't have anything." State's Exhibit 55 at 170.

## CASE HISTORY

On June 11, 2010, the State charged McConniel with neglect of a dependent resulting in death as a class A felony. On March 30, 2011, McConniel filed a Motion for Funds for Expert Witness stating that an expert witness was pertinent to assist defense counsel in preparing for trial and that McConniel was indigent.[4] The court heard arguments on McConniel's motion at a hearing on March 31, 2011, and denied the motion on April 7, 2011. At trial, McConniel renewed her Motion for Funds for Expert Witness, and the court denied the motion. Later during trial, defense counsel presented an offer of proof and presented the credentials of two physicians that could possibly have served as expert witnesses. The court noted that McConniel had "an ample opportunity

---

[4] McConniel also filed a Motion for Ex Parte Determination of Defendant's Motion for Appointment of Experts on March 15, 2011, which the court denied on March 17, 2011.

22

to present specifics on the experts that [she] wished the Court to grant [] funds to hire," that "[n]one of that occurred at [the March 30, 2011] hearing," that the motion "was denied specifically because there were no specifics as to need," and that the "request was over broad and vague." Transcript at 1299. The court did not alter its ruling on McConniel's motion. The jury found McConniel guilty of neglect of a dependent resulting in death as a class A felony.[5]

In its sentencing order, the court found that little weight should be given to McConniel's lack of prior recorded criminal history and history of being a victim of sexual and physical abuse, that there was a significant degree of care and planning in the commission and cover up of the crime on the part of McConniel, that the crimes were committed in front of other minor children that lived in the home, that the injuries suffered by the victim were significant and greater than the elements necessary to prove the commission of the crime, and that the facts of the case are particularly heinous and disturbing. The court noted that it was upon McConniel's insistence that Lauren was removed from her mother, that the motive for taking Lauren from her mother was for financial gain, and that McConniel insisted that Ryan withhold information as to their whereabouts to prevent contact between Lauren and her mother. The court found that it was clear that McConniel was a principal and not just a forced unwilling participant in the systematic torture that was inflicted upon Lauren which literally drove the child over the brink of insanity.

---

[5] Ryan entered into a plea agreement pursuant to which he agreed to plead guilty to neglect of a dependent as a class B felony and to aid in the investigation and prosecution of those persons responsible for the abuse, neglect, and death of Lauren including but not limited to McConniel, Robert, Angela, and Samra.

The court further found that McConniel actively participated in the physical abuse to which Lauren was subjected repeatedly for months leading up to her death, including hitting Lauren on the legs with wet rags, hitting her on her hands and feet with the wooden stick, forcing Lauren to do jumping jacks until she threw up, and making Lauren hold heavy objects with her arms straight out. The court also noted that McConniel took affirmative action to cover up the abuse and to avoid detection, including lying about ongoing medical care with Dr. Shoemaker and orchestrating and delivering lies and deception to other health care providers. The court further noted that the crime has been devastating to Lauren's family, that the acts of physical abuse occurred in front of Lauren's nine-year-old sister and four-year-old half-brother, for which it was recommended that each receive therapeutic treatment, and that McConniel lacked remorse and did not take any responsibility for her actions. The court sentenced McConniel to fifty years in the Indiana Department of Correction.

## ISSUES

### I.

The first issue is whether the court abused its discretion in denying McConniel's Motion for Funds for Expert Witness. McConniel maintains that her conviction must be reversed because the court erred in denying her motion for funds to hire expert witnesses that were necessary for trial. McConniel asserts that the case was complex and the means of Lauren's death was a material issue and that she met her burden as to specificity. The State argues that McConniel failed to establish any showing of good cause for public funds to hire expert witnesses and that McConniel was not prejudiced by any error. The

24

State further argues that defense counsel did not create a record that would allow for appellate review until after the State had presented its evidence, that only then did defense counsel reveal the experts which McConniel allegedly would have presented, and that this was improper as it blindsided the trial court. The State also argues that "in both this issue and the sufficiency issue in her brief, [McConniel] implies that the State relied on hypernatremia to prove that she had committed Neglect of a Dependant" but that the State's evidence emphasized McConniel's neglect of Lauren. Appellee's Brief at 27. In her reply brief, McConniel argues that consideration of the cause of death was relevant to the charge McConniel faced.

The appointment of experts for indigent defendants is left to the trial court's sound discretion. Beauchamp v. State, 788 N.E.2d 881, 888 (Ind. Ct. App. 2003) (citing Jones v. State, 524 N.E.2d 1284, 1286 (Ind. 1988)). It is within the trial court's discretion to determine whether the requested service would be needless, wasteful or extravagant. Id. The trial court is not required to appoint at public expense any expert that the defendant might find helpful. Id. The defendant requesting the appointment of an expert bears the burden of demonstrating the need for the appointment. Id.

The central inquiries in deciding this issue are whether the services are necessary to assure an adequate defense and whether the defendant specifies precisely how he would benefit from the requested expert services. Scott v. State, 593 N.E.2d 198, 200 (Ind. 1992). A defendant cannot simply make a blanket statement that he needs an expert absent some specific showing of the benefits that the expert would provide. Id. The trial court may consider whether the proposed expert's services would bear on an issue for

25

which expert opinion would be necessary or the request for an expert appears to be exploratory only, whether the expert services will go toward answering a substantial question or simply an ancillary one, the severity of the possible penalty the defendant faces, the cost of the expert services, and the complexity of the case. Id. at 200-202.

Here, the record reveals that McConniel, in her offer of proof, offered information from two physicians the defense had considered hiring, one of whom was a clinical director of nephrology and hypertension at Children's Hospital in Cincinnati, and the other was an associate professor in child and adolescent psychiatry at the University of Cincinnati. Defense counsel stated that the director at Children's Hospital "could have provided much insight into hypernatremia and also to state specifically that there are more . . . than one way that an individual can have an increased sodium level and the causes of different hypernatremia to contradict exactly what was stated here in Court by the several physicians who have testified . . . ." Transcript at 1293. Defense counsel stated that the psychiatrist would testify regarding when a child acts out following abuse.

We first observe that defense counsel argued to the court that it had specific physicians which it considered calling as witnesses only during trial after the testimony of the State's witnesses. We further observe that a number of physicians and other medical personnel who treated Lauren or were presented as experts testified in the case, and McConniel does not argue that she did not have the opportunity to depose or cross-examine at trial each of the witnesses regarding their examination of Lauren or their understanding of hypernatremia and how Lauren's hypernatremia or their understanding of her condition may have impacted their testimony. Moreover, the evidence presented

26

by the State did not pertain solely to the issue of whether Lauren was forced to ingest table salt but rather included a great deal of testimony and evidence related to the physical abuse suffered by Lauren and Lauren's malnourishment which contributed to her death. Dr. Weist testified that "[t]he biggest issue besides the sodium level . . . was [Lauren's] malnutrition," that Lauren was seizing "because of her malnutrition," and that once Lauren's body was stressed enough it "just could not . . . handle it anymore." Id. at 933, 937.

Dr. Weist testified that "[t]here are certain medical conditions that can cause a high sodium, none of which I knew that would cause something as high as [Lauren's] except for breast-feeding failure, and obviously that was not in her case." Id. at 933-934. Dr. Weist consulted with a number of various colleagues, including a kidney specialist, a metabolism doctor, an endocrine doctor, and a toxicologist, and Lauren's physicians were unable to find a reason for Lauren's high sodium level and all believed that Lauren had ingested salt. Another expert testified that, based upon her condition, Lauren must have had inadequate caloric intake for a period of months. The coroner who examined Lauren's body testified that her malnourishment and malabsorption, the fact that she was not adequately taking in fluid and was eating poorly, contributed to Lauren's death.

Based upon our review of the record and the State's arguments before the jury, we cannot say that additional expert testimony was necessary to ensure that McConniel received an adequate defense, and the court did not abuse its discretion in denying McConniel's Motion for Funds for Expert Witness. See Scott, 593 N.E.2d at 199-202 (holding that the jury could decide without an expert's testimony whether the

27

defendant formed the intent to commit the crimes in light of his actions before, during, and after the crimes and that the proposed expert was not necessary to ensure that the defendant received an adequate defense); Kocielko v. State, 938 N.E.2d 243, 255 (Ind. Ct. App. 2010) (holding that the trial court did not abuse its discretion in deciding not to provide the defendant with a DNA expert at public expense and that the defendant failed to provide specifics as to identity, cost, and the precise benefit to be gained by an expert), reh'g granted on other grounds, 943 N.E.2d 1282 (Ind. Ct. App. 2011), trans. denied.

Further, we conclude that McConniel was not prejudiced by the denial of her motion. An error will be found harmless if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties. Gault v. State, 878 N.E.2d 1260, 1267-1268 (Ind. 2008). The charging information, the evidence presented by the State, and the closing arguments emphasized McConniel's neglect of Lauren, McConniel's abuse of Lauren, Lauren's malnourishment, and the fact that Lauren's malnourishment resulted in her death, and not merely the evidence regarding the manner of death or the specific medical condition which ultimately resulted in death. McConniel has not demonstrated that the denial of her motion affected her substantial rights and any error in denying her motion was harmless.

## II.

The next issue is whether the evidence was sufficient to sustain McConniel's conviction for neglect of a dependent as a class A felony. When reviewing claims of

28

insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. Jordan v. State, 656 N.E.2d 816, 817 (Ind. 1995), reh'g denied. Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. Id. We will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. Id.

McConniel argues that the evidence was insufficient to support her conviction for neglect of a dependent resulting in death where the cause of Lauren's death was hypernatremia but testimony was speculative as to how the sodium entered Lauren's system. McConniel acknowledges that "there was abundant evidence of mistreatment" of Lauren but argues that the cause of her death "was complications of hypernatremia," that "[c]ontributing causes were malnourishment and non-organic failure to thrive," that McConniel "appears to have attempted to obtain medical attention" for Lauren on the day she began "exhibiting symptoms consistent with hypernatremia," and that "[p]hysicians only could speculate at trial the proximity of [Lauren's] ingestion of salt, the apparent cause of the elevated sodium levels in her blood." Appellant's Brief at 24-25.

The State argues that it sufficiently proved that McConniel knowingly deprived Lauren of necessary support and that her neglect caused Lauren's death. In support of its argument, the State points to testimony that McConniel cared for other children who were healthy, that Lauren became targeted by McConniel for abuse, that McConniel's relatives, neighbors, and medical professionals observed Lauren's rapid deterioration, that McConniel lied to conceal her neglect and allow Lauren's condition to worsen, and that three of Lauren's physicians had an extremely high level of concern that abuse and

29

neglect had occurred. The State also argues that it never relied on the theory that McConniel caused Lauren's hypernatremia but that the information and trial evidence emphasized McConniel's neglect of Lauren.

The offense of neglect of a dependent is governed by Ind. Code § 35-46-1-4, which at the time of the offense and the charging information provided in part under subsection (a) that "[a] person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally: (1) places the dependent in a situation that endangers the dependent's life or health; (2) abandons or cruelly confines the dependent;" or "(3) deprives the dependent of necessary support . . . commits neglect of a dependent, a Class D felony." However, the offense is a class A felony "if it is committed under subsection (a)(1), (a)(2), or (a)(3) by a person at least eighteen (18) years of age and results in the death of a dependent who is less than fourteen (14) years of age." Ind. Code § 35-46-1-4(b)(3). The charging information alleged that "McConniel, being at least 18 years of age and having the care of [Lauren], a dependent less than 14 years of age, did knowingly deprive [Lauren] of necessary support and which resulted in the death of [Lauren] . . . ." Appellant's Appendix at 28.

As set forth in part above, the record reveals that the State presented evidence replete with actions by McConniel which constitute neglect of a dependent. McConniel was confronted about Lauren's worsening condition by family, neighbors, and health care workers, and McConniel failed to obtain medical help for Lauren and repeatedly lied to Ryan and health care professionals that Lauren had been seen by a doctor and dietician and was receiving care. McConniel's other children were healthy and attended medical

30

appointments. Ronald testified that it was obvious that Lauren needed medical attention. Dr. Weist testified that she had noted that Lauren was severely emaciated and malnourished, that there was no attempt to seek help, and that she believed McConniel's actions of not feeding Lauren constituted active abuse. Another physician testified that McConniel's failure to seek medical aid for Lauren was "directly responsible" for her condition. Transcript at 1255.

When Lauren was taken to Ball Memorial Hospital on March 2, 2010, medical personnel observed that Lauren appeared "emaciated," "all skin and bones," and "sunken in face," and that her deteriorated condition, especially based on the exposed face and extremities, was obvious. Id. at 776. When Lauren arrived at Riley Hospital on March 3, 2010, she was malnourished, emaciated, dehydrated, and extremely lethargic, weighed twenty-eight pounds, her bones, ribs, and clavicle were pressing against her skin, and her cheekbones were very prominent. Lauren had little or no subcutaneous fat under her skin. Lauren did not have any tears, the mucus membranes in her mouth were dry, and the capillary refill on the tips of her fingers was delayed. One physician testified that Lauren was "shockingly underweight" and almost "skin and bones." Id. at 923. Dr. Weist testified that it was obvious that Lauren's symptoms and condition required immediate medical attention and that Lauren's caregivers obviously should have sought medical treatment much earlier. The coroner found the cause of Lauren's death to be "[c]omplications of hypernatremia, or high sodium" and "non-organic failure to thrive" or malnourishment as the contributing cause. Id. at 1150. The coroner believed that

31

Lauren's malnourishment and malabsorption, the fact that she was not adequately taking in fluid and was eating poorly, contributed to Lauren's death.

A reasonable trier of fact could have concluded from the evidence presented at trial that McConniel knowingly deprived Lauren of necessary support and that the deprivation resulted in Lauren's death. Based upon the evidence most favorable to the conviction, we conclude that sufficient evidence exists from which the jury could have found McConniel guilty beyond a reasonable doubt of neglect of a dependent as a class A felony. See Wright v. State, 818 N.E.2d 540, 548-549 (Ind. Ct. App. 2004) (affirming the defendant's convictions for neglect of a dependent and holding that there was overwhelming evidence to conclude that he knew the children needed medical care, that it was obvious and apparent to any reasonable layperson that the children were in dire need of medical assistance, and that the children's condition was a "jaw dropper"), aff'd in part, rev'd in part on other grounds, 829 N.E.2d 928 (Ind. 2005).

## III.

The next issue is whether McConniel's fifty-year sentence is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B) provides that this court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. Childress v. State, 848 N.E.2d 1073, 1080 (Ind. 2006).

McConniel contends that her fifty-year sentence is excessive in light of the nature of the offense and her character. Specifically, McConniel argues that she had no prior criminal history, that during the pre-sentence investigation she reported physical abuse she suffered at the hands of Ryan, and that she also related repeated molestations she suffered from her father beginning at age four. The State argues that the circumstances of this crime are particularly heinous, that the length and degree of suffering that Lauren endured were atrocious, that the malnourishment of Lauren occurred over several months, and that McConniel's cruelty traumatized the other children in the household. The State also argues that McConniel's character warrants the enhanced sentence as McConniel plotted to take Lauren from a stable home so that she could reap monetary compensation, intentionally targeted Lauren, covered her abuse by lying to Ryan and medical professionals about seeking medical help for Lauren, and never expressed any remorse for her treatment of Lauren and Lauren's death.

The record reveals that Lauren's suffering was significant and that she suffered for a considerable period of time. McConniel's extremely abusive behavior toward and neglect of Lauren over a period of months is beyond shocking. McConniel demanded that Ryan take Lauren from her mother, presumably so that Ryan could pursue support payments, and then proceeded to abuse and neglect Lauren while insisting that Ryan withhold information from Lauren's mother as to Lauren's location. McConniel's abuse and neglect of Lauren caused Lauren to suffer extreme pain physically, emotionally, and psychologically, ultimately resulting in her death. The physical abuse inflicted by McConniel included hitting Lauren with a wet cloth and with a stick made from two

wooden side railing pieces of a baby crib that had been taped together, forcing Lauren to do jumping jacks until she vomited, forcing Lauren to hold heavy objects for extended periods, force-feeding Lauren until she vomited, and failing to feed and provide nourishment and hydration for Lauren. McConniel permitted the other children to punch Lauren and to smash Lauren's hand in a door. Lauren stated that she was not allowed to come upstairs from the basement. McConniel's family, neighbors, and health care workers had a discussion with or confronted McConniel regarding Lauren's worsening physical condition, and McConniel refused to obtain medical help for Lauren and repeatedly lied to Ryan and health care providers that Lauren had been seen by a doctor and was receiving care. The other children under McConniel's care were healthy and received medical appointments, and those children witnessed McConniel's abuse and neglect of Lauren.

While the record reveals that McConniel does not have a criminal history, the nature of the offense and the character of the offender revealed by the evidence presented leads us to the conclusion that the sentence imposed by the trial court is not inappropriate.

For the foregoing reasons, we affirm McConniel's conviction and sentence.

Affirmed.

FRIEDLANDER, J., and RILEY, J., concur.